[Civ. No. 25965. Second Dist., Div. One. Nov. 7, 1962.]

DOLORES DOUGLASS, Plaintiff and Respondent, v.
E. WEBB et al., Defendants and Appellants.

Chase, Rotchford, Downen and Drukker and William G. Tucker for Defendants and Appellants.

Paul P. Selvin and Sam Schermer for Plaintiff and Respondent.

LILLIE, J.—Defendants appeal from an $18,000 judgment based on a jury verdict for personal injuries sustained by plaintiff when a pickup truck in which she was riding rolled over an embankment; they raise three main issues—the insufficiency of the evidence and errors in reference to insurance and certain instructions.

In connection with appellants' first point, we view the evidence in a light most favorable to respondent indulging all reasonable inferences in her favor. (*Ades* v. *Brush,* 66 Cal. App.2d 436 [152 P.2d 519].) Plaintiff's husband, Jack Douglass, borrowed a Ford pickup truck from a coemployee and friend, Mr. Khoury, for the purpose of hauling some furniture. Sometime previously Khoury had attached a rear bumper to the truck frame with only one bolt on each bumper frame, although they provided for two; the bumper was smaller than the width of the truck and extended a distance from its rear. Khoury did not know that Douglass intended to use a trailer. Douglass and another friend and fellow employee, Orville Nutt, took the truck to The Valley Trailer Rentals owned by defendants Webb. Douglass picked out a four-wheel trailer and rented it from them for $8.00. Gary Edwards, the employee in charge, was then 17 years old; he filled out the rental contract and with the help of another hooked the trailer to the bumper of the truck. Defendants' instructions to their employees in mounting trailers was to hook the trailer to the bumper and test the latter for looseness and vertical movement by moving it up and down and standing on it. No other inspection or test was made by Edwards or his coemployee, nor did they check the trailer for sideways motion (lateral stability) or "elasticity;" their only inspection or test consisted of moving the hitch up and down and then standing on the bumper. While the bumper protruded a distance from the rear of the truck Edwards conceded he did not consider this in his inspection test; the bumper had one bolt on each frame although the frames provided for two. At no time did Douglass receive any instructions relative to the trailer. He then returned to his home and Nutt helped him load the trailer with furniture, putting the heavy appliances forward which tilted the trailer to the front. In loading it Nutt attempted to achieve a balanced load. With plaintiff and Nutt in the cab and the children in the bed of the truck, Douglass drove to the Ventura Freeway. He had the truck in low gear when he entered the on-ramp, then shifted to second as he entered the freeway and reached a cruising speed

of 40 to 45 miles an hour. As he shifted into high gear the trailer swayed widely right and a violent lurch to the left caused the truck to turn sharply back to the right and go over the embankment. The force broke the coupling; the trailer did not overturn. Plaintiff was injured.

The evidence shows the bracing and reinforcement of the rear bumper of the truck and its supports were inadequate to pull the trailer; it also establishes that the inadequacy of the bumper frame extension on which indirectly the hitch was fastened and the low lateral load of the trailer bearing against the bumper created a deflection and that this elastic link between the trailer and the truck prevented the trailer from following the truck in a responsive manner — there was a delay — and when a steering correction was made the trailer was slow to respond and moved laterally or horizontally, and that this caused the swaying and the accident.

Appellants claim plaintiff failed to establish any duty on their part to be responsible for the inadequacy of the bracing and reinforcement of the bumper of the truck. But this was never plaintiff's position. She contended in the court below that defendants mounted the trailer and that one who mounts or attaches a trailer to an insufficiently reinforced or braced frame acts contrary to the standard set forth in section 701, subdivision (d), Vehicle Code, and the custom and practice of the trailer rental industry, and is negligent; on the other hand, defendants claimed that the cause of the accident was an unbalanced load heavily weighted in the rear, and excessive speed of the truck. Former section 701, subdivision (d), Vehicle Code, provides in pertinent part: ". . . Every drawbar and trailer hitch or coupling used as a means of attaching the towed and towing units shall be properly and securely mounted and be structurally adequate for the weight drawn. The *mounting* of the trailer hitch on the towing motor vehicle *shall include sufficient reinforcement or bracing of the frame to provide sufficient strength and rigidity to prevent undue distortion of the frame.*" (Emphasis added.) It can hardly be doubted that the trailer renting industry is expected to concern itself with the safety of those of the public for whom it mounts trailers; those so engaged do and should, by reason of their trade and experience, as between themselves and the general public, possess superior knowledge of the physical propensities of trailers and vehicles to which they are to be attached and how to test the adequacy of both, and are and should be familiar with any practice, standard or rule regu-

lating the mounting of trailers. The practice of the trailer renting industry when mounting trailers on vehicles brought in by the public, according to defendant Webb, is—to first check to see if a hitch can be put on the bumper; if it can, to secure the hitch to the bumper and either stand on it or push up and down with a hand on the hitch to see if it "is securely fastened and see if there are any bolts loose in the bumper, and if there are, to either tighten the bumper or turn it down—tighten the bolts up on the bumper or turn the customer down." Webb further testified it was the custom and practice to inform those renting trailers how they should be loaded (heavily in the front) and the speed limit (then 45 miles).

Plaintiff claims that the manner of mounting the trailer to the bumper of the truck was contrary to the standard set forth in section 701, subdivision (d), Vehicle Code, and the custom and practice of the trade, in that defendants' mounting did not include sufficient reinforcement or bracing of the frame; that defendants, in the trailer rental business, and who mount trailers, know or should know whether use of their equipment is proper and safe with a specific vehicle, that to make such a determination they must inspect and test the vehicle to which they attach the trailer, and that in making the mounting they bring themselves within the ambit of section 701, subdivision (d), which relates to *any* mounting of a trailer hitch on a towing vehicle; and that it was a question for the jury whether defendants acted reasonably in this connection and whether their negligence was a proximate cause of the accident. The condition of the bumper clearly showed insufficient reinforcement or bracing of the frame for properly mounting a trailer, defendants' inspections and tests at the time they mounted the trailer were inadequate, and Douglass was given no instructions by defendants relative to the trailer; the jury found these facts to be true, and properly so, and in light of section 701, subdivision (d) and the custom and practice of the trade, determined defendants to be negligent.

Appellants claim there was no evidence of any distortion of the frame of the truck. ▮▮▮ While in ordinary usage "frame" and "bumper" may well be two separate and distinct definitions, it is apparent from the language used in section 701, subdivision (d) and reference in the pertinent portion to the mounting of a trailer hitch on a towing vehicle, that where "frame" is used therein, it includes within its

meaning the bumper of the towing motor vehicle. As to damage to the bumper, plaintiffs' expert testified he found no "permanent" deformation, but he did say that "all the time this (trailer) was being hauled, there was horizontal oscillation or movement of his bumper;" and that "(T)he deflection that this bumper underwent in being moved horizontally, from left to right, back and forth; the amplitudes, the amount that it was moved in one direction or another, increased as the speed of the pickup truck picked up from the 20 or 30 miles an hour before the Freeway, to the 35 or 40 or 45 speeds on the Freeway."

■ Appellants declare "they do not regard as credible" the testimony of plaintiff's expert witness, Severy; they advance argument relative to his qualifications and the purported conflicts in his testimony and inaccuracies of certain of his measurements. The trial judge, exercising his discretion, determined Severy to be qualified as an expert (*Pfingsten* v. *Westenhaver*, 39 Cal.2d 12 [244 P.2d 395] ; *Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485]) ; the criticisms leveled against Severy's testimony go only to its weight, and the jury, after hearing all of the evidence, as it had a right to do, accepted the conclusion of the expert.

■ ■ Appellants allude to a declaration of Dr. Morelli which they filed with their motion for a new trial; they claim it shows inaccuracies in Severy's methods of measuring and weighing the full load on the trailer immediately after the accident to determine if there was any imbalance. If Morelli's declaration is herein referred to for the purpose of controverting the testimony of Severy, such reference is improper for its contents were never part of the evidence in the trial; if it is referred to for the purpose of showing error in the denial of their motion for new trial the reference is without weight for it is obvious on its face that the declaration contains nothing that could not have been obtained by defendants and presented to the court during the trial after hearing Severy's testimony.

■ Nor is appellants' claim that the evidence does not support the amount of the verdict and that $18,000 is grossly excessive, tenable. The record shows that plaintiff suffered multiple fractures, abrasions and contusions all over her body —below the left ear, over the right scapula, and on the right arm, posterior chest cage, and the left knee, calf and leg— and severe back pain to the extent she was unable to sit up for an examination after the accident. X-rays were taken

and an orthopedic surgeon was consulted; she was hospitalized 21 days. More than two years after the accident she suffered serious limitation of motion in her right shoulder and arm, interfering with her household work, and considerable pain; hypesthesia in the upper third of her arm; atrophy in the upper lateral half of her right arm; intermittent mid-back pain; and easy fatigability.

 Shortly prior to the accident she had been laid off as a cookie packer in a bakery but there is no evidence she could not have worked had she not been injured, for she was called back to her job one week before the accident. Obviously she could not work during her three-week hospitalization and for some time thereafter. Her doctor testified she could not undertake employment which required excessive use of her right arm or back. Thus an instruction relative to loss of earnings was proper.

Appellants argue that evidence of the nature and extent of plaintiff's injuries came only from her testimony and that of Dr. Danko; and that laxity in exercising and taking treatments prescribed for her, her subsequent care of her family without help, and admission in a divorce action that she had no major physical defect, establish the gross excessiveness of the amount of the verdict. What better way can a plaintiff prove his injuries, pain and suffering than by his own testimony and that of the doctor who examined and treated him? While plaintiff's failure to call the orthopedic specialist may have provided a legitimate point of argument to the jury in favor of the defense, she was not required to call him as her witness; had defendants wanted to take the chance that he would testify plaintiff's condition was not as represented, there was nothing to prevent them from subpoenaing him. Relative to the evidence, the jury, weighing the testimony and resolving all asserted conflicts and inaccuracies, found the extent of her injuries and pain and suffering and permanent impairment, and fixed the amount of her damage accordingly. In accord with the principles set forth in *Seffert* v. *Los Angeles Transit Lines,* 56 Cal.2d 498 [15 Cal.Rptr. 161, 364 P.2d 337], we will not disturb the jury's findings.

 Said the court therein at page 508: "There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. [Citation.] The amount to be

awarded is 'a matter on which there legitimately may be a wide difference of opinion' [citation.] In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record [citation].''

Appellants' next point is that reference to insurance was deliberately and wrongfully interjected into the case by respondent's counsel conveying the inference to the jury that they were insured. Defendants called as their witness one Longacre who had been traveling behind Douglass immediately before the accident; they tried to establish by his testimony excessive speed of the truck. However, on direct and cross-examination he made inconsistent statements relative to its speed; finally on redirect examination, on the basis of surprise and with permission of the trial judge, in general impeachment of his own witness, defense counsel referred Longacre to a written statement signed by him a month after the accident showing a declaration of the truck's speed favorable to defendants. Thereafter, on recross examination, respondent's counsel inquired of Longacre into the circumstances surrounding his signing the statement. Since it was written by another person, counsel sought to elicit from him who came out to see him and wrote the document, and asked: ''Was he a representative of the Great American Insurance Company?'' An objection thereto was sustained. Then in response to subsequent questions Longacre said he didn't know who he was, that he mentioned something about representing the trailer company but beyond that he remembered nothing, and did not remember his name. A motion for mistrial was denied.

Inasmuch as Longacre signed a statement written by a third party only a short time after the accident, on the issues of bias, interest and credibility it was proper for counsel to inquire concerning the circumstances under which he signed it and the identity of the man who came to him, talked to him, elicited information from him and wrote the statement for him to sign, upon which statement defense counsel relied to impeach his own witness. And if it develops that the man was a representative of an insurance company, counsel has the right to make further inquiry into the circumstances. If an insurance company on behalf of an insured sends someone to talk with a witness whom it knows may later testify in a trial in which it will be interested, that fact may become relevant; it does not preclude the opposing party, if

the insured calls that witness as his own, from inquiring into the fact or the details of any conversation or statement which may have taken place upon which the insured seeks to rely, if such inquiry is pertinent and proper for the purpose of testing the credibility of a witness or weighing his testimony. (*Moffitt* v. *Ford Motor Co.*, 135 Cal.App. 7 [26 P.2d 661]; *Wilson* v. *Fredericksen & Kasler*, 94 Cal.App.2d 361 [210 P.2d 741]; *Causey* v. *Cornelius*, 164 Cal.App.2d 269 [330 P.2d 468].) However, counsel here mentioned the insurance company in his effort to refresh Longacre's recollection before he had exhausted other normal inquiry concerning the identity of the third party and before he testified he could remember neither his name nor who he was. This convinces us that counsel's reference to the named insurance company at that time was both improper and deliberate. But in view of the circumstances we do not deem it to have been prejudicial to defendant's rights. ▇▇▇ While mere mention of insurance under a certain set of facts might be improper, it is not always reversible error; whether it is prejudicial depends on the individual circumstances and the effect it may have on the trier of fact. It has been said, the vice of mention of insurance in a case of this kind is the so-called strong popular prejudice against sureties or other insurance companies which the jury is apt to permit to sway its judgment upon learning the fact that defendant is insured (see *Causey* v. *Cornelius*, 164 Cal.App.2d 269 [330 P.2d 468]); but today, due to common knowledge among laymen that in cases of this kind the real defendant is the insurance company, prejudice can hardly result from mere mention of insurance, if the circumstances are not aggravated (as in the numerous cases cited by appellants), if it could have made no difference in the final outcome of the case or award, and if the verdict is not excessive. (*People* v. *American Auto. Ins. Co.*, 132 Cal.App.2d 317 [282 P.2d 559]; *Toomes* v. *Nunes*, 24 Cal.App.2d 395 [75 P.2d 94]; *Moniz* v. *Bettencourt*, 24 Cal.App.2d 718 [76 P.2d 535].) ▇▇▇ And, as a matter of fairness, if the party in the court below considers the matter to be prejudicial, he should then do all he can by way of objection, oral admonition and written instructions to dissipate any influence it might have on the jury. (*Kershaw* v. *Tilbury*, 214 Cal. 679 [8 P.2d 109]; *Aydlott* v. *Key System Transit Co.*, 104 Cal.App. 621 [286 P. 456].) ▇▇▇ One cannot be apathetic about such a situation in the hope of a favorable outcome, and then, if the trial results in an unfavorable verdict, complain of prejudice on

appeal. (*Causey* v. *Cornelius,* 164 Cal.App.2d 269 [330 P.2d 468].)

But plaintiff's counsel was not the first to mention insurance; it was first made by defendant, Weston Webb. Webb by his testimony had inferred that he repaired the trailer before learning of plaintiff's claim; plaintiff's counsel sought on cross-examination to establish that he knew long before, and asked him if he recalled a man by the name of Caton who talked with him about his client's claim two days after the accident. Webb did not remember so to refresh his recollection, he said: "You referred him to a Mr. James Johnson," whereupon Webb answered: "Oh, you mean for insurance." It was after this that the examination of Longacre took place.

Defendants first mentioned insurance; thereafter further reference by plaintiff's counsel resulted from a circumstance introduced by defendants themselves when defense counsel opened up the general area by putting forth the statement signed by their witness Longacre in an effort to impeach him. As stated by the trial judge on the issue of prejudice in denying the motion for mistrial, "So, if the jury was subsequently advised of the probability of insurance here on the part of the defendants, they had likewise probably been so advised by the utterance of Mr. Webb himself." Objection was made, as was a motion for mistrial; and in denying the motion the trial judge told defense counsel that had an admonition been requested he would have given it, and that if he would request an oral admonition to the jury to disregard any implication contained in the question and would submit a special instruction form he would give them both. That it was defense counsel's judgment that admonition and instruction to the jury would only magnify the asserted unfavorable effect does not change the fact that he refused to do as suggested by the judge. Finally the lower court, on its own motion, gave a cautionary instruction that no insurance company is a party and whether any party is insured has no bearing on the issue and an instruction to disregard questions of counsel objected to, as not evidence. ▮ The trial judge, after reviewing the entire case, the evidence and the circumstances leading up to the reference to insurance, twice rejected defendants' claim of prejudice—first, immediately after the reference was made in denying their motion for mistrial and then, after the verdict, in denying their motion for a new trial. Although a ruling of the lower court on the point

at issue in the denial of these motions is not conclusive, it is entitled to considerable weight in our determination of prejudice. (*Ades* v. *Brush,* 66 Cal.App.2d 436 [152 P.2d 519].)

The lower court refused certain requested instructions relating to joint venture; appellants claim to have proved a joint venture consisting of Jack Douglass, plaintiff, Khoury and Nutt, encompassing the whole process of moving, including the driving of the truck. They point to evidence that Khoury loaned his truck to Douglass to be used for the purpose of moving, that Nutt was asked by Douglass to go with him to defendant's place of business and help him move, that the trailer rental was paid with community funds, as was payment to Khoury for damage to his truck, and that Nutt helped pack and load the trailer and accompanied the Douglasses in the truck to help unload. ▇ We find no evidence to support any instruction imputing to plaintiff liability based upon a joint venture, either among the four persons hereinabove mentioned or between Mr. and Mrs. Douglass, and no error in the court's failure to so instruct. The record fails to establish any of the elements necessary to constitute a joint venture. (*Stilwell* v. *Trutanich,* 178 Cal.App.2d 614 [3 Cal. Rptr. 285].) Khoury, who merely loaned his truck to a friend, had no interest in the moving operations nor did he participate in any of them; he was even unaware a trailer would be used with his truck; he received no benefit from the loan of the same and received no pay for its use; and for what loss he sustained by reason of damage to the truck, he was compensated by the Douglasses. Nutt, only as an act of friendship, without compensation therefor or expectation thereof, helped Douglass with the physical labor of loading and unloading. There is no evidence of any kind that the Douglasses, Khoury and Nutt intended to form a partnership or joint venture; that they were to participate in any benefits, profits or gain by their association, or that they did so; that they would share any injury or loss, and they did not; that Khoury or Nutt had any right to participate in the control of the moving operation, truck or trailer; or that any fiduciary relationship existed among them. ▇ In their opening brief appellants argued that Khoury was one of the ''joint venture''; however in their closing brief they concede that the evidence did not show any involvement of Khoury and claim his name should not have been mentioned in the proffered instruction. But regardless of the reason for the inclusion of Khoury's name, the trial judge had a right to refuse it, erroneous on its face, without

modifying it. (*Davis* v. *Johnson,* 128 Cal.App.2d 466 [275 P.2d 563].) Even so, neither does the evidence support any joint venture among Nutt, plaintiff and her husband.

As to the court's asserted error in failing to instruct on the theory that Mr. and Mrs. Douglass alone, were in a joint venture, we find in the record no such instruction requested; in the absence of such showing defendants will not now be heard to complain. (*Phillips* v. *Noble,* 50 Cal.2d 163 [323 P.2d 385].) In their closing brief, appellants refer to BAJI No. 210F, but this instruction is incomplete— a prepared form, the blanks are left open, any identifying names are omitted, and the vital part of the charge nowhere contains the names of Mr. or Mrs. Douglass. On these omissions alone, the court was justified in refusing to give the instruction. (*Shaw* v. *Pacific Greyhound Lines,* 50 Cal.2d 153 [323 P.2d 391].) In any event the impropriety of such an instruction is obvious; "the family relationship standing alone is not sufficient to convert family activities into joint enterprises for the purposes of imputing negligence." (*Flores* v. *Brown,* 39 Cal.2d 622, 630 [248 P.2d 922].)

Appellants also complain that the trial judge instructed on the duty of a supplier of chattels without giving the correlative instruction on the duty of a user of chattels. They refer to BAJI No. 155 requested by them and refused. Respondent argues that their proffered instruction relates to a supplier and not a user; we deem her position to be substantially correct. The instruction, while initially declaring that it concerns the duty of one who has "control" of the chattel with "right to inspect and repair the same," the body of the instruction clearly specifically charges the duty described therein to one who is a "custodian" of a chattel and who "may furnish" the same to a user. Actually No. 155 starts a series of instructions relating to the duty of one having a chattel in his possession and furnishing it to another; 155 specifies one who has "control" over a chattel and furnishes it; the next, 155A, properly given by the court on its own motion, relates to a "supplier." Jack Douglass was not one who had control over the trailer with the right to inspect and repair the same and who furnished it to a user under No. 155. Neither was he its custodian nor the one who mounted it; in both instructions, Nos. 155 (refused), and 155A (given) he was the user after the trailer was furnished to him and attached to his truck. Having actually proffered no instruc-

tion relative to Douglass, as a user, appellants cannot now complain one was not given. (*Phillips* v. *Noble*, 50 Cal.2d 163 [323 P.2d 385].) ▮▮▮ Even so, the lack of any specific instruction relating to the duty of a user could not, in the light of the entire instructions given, lead to any erroneous conclusion that while a supplier had a duty to preserve the safety of plaintiff, Douglass did not. The jury was instructed on proximate cause, concurrent cause, intervening cause, the duty of one using the highway, basic speed law, due care, et cetera; the instructions fully and fairly covered the issues. (*Treadwell* v. *Nickel*, 194 Cal. 243 [228 P. 25] ; *Buck* v. *Standard Oil Co.*, 157 Cal.App.2d 230 [321 P.2d 67].) As to intervening cause, the jury was properly instructed thereon precisely as defendants requested, and it found that Douglass' acts were not an intervening cause of the accident.

Appellants attach error to an instruction based on former Vehicle Code, section 701, subdivision (d), coupled with instruction No. 149. No. 149 charged that a presumption of negligence was raised by a violation of certain sections, among them, section 701, subdivision (d) ; it was requested by defendants, as well as plaintiffs. However, if the instruction based on section 701, subdivision (d) was properly given, so was No. 149 insofar as it relates to that section. The instruction primarily challenged consisted only of a reading of former section 701, subdivision (d); appellants say it placed on trailer renters a statutory duty to assure that any vehicle towing a trailer rented by them has "sufficient reinforcement or bracing of the frame," which placed an unfair burden on trailer renters in that they are held responsible for conditions beyond their control. ▮▮▮ The fallacy of the argument lies in the fact that the standard set up in section 701, subdivision (d) relates not to "trailer renters" but to anyone who mounts a trailer. The section is directed to no specific person—commercial renter, owner, user, et cetera—it applies to any mounting of a trailer hitch on a towing vehicle, without regard to who makes it. The instruction did not mention defendants and it was for the jury to determine to whom it applied. Actually, defense counsel recognized this for he unsuccessfully argued to the jury that it was Douglass and Nutt-who violated the section, not defendants. The obvious purpose of the Legislature in enacting section 701, subdivision (d) was to protect against an inadequately mounted trailer; it was not to regulate the trailer renting industry. Nor, as urged by appellants does the section make a trailer renter

responsible for a condition of a vehicle he had never seen; but it does require one who mounts a trailer hitch to a towing vehicle to use reasonable care in doing so. And in the case at bar, the jury was so instructed for the section was read with the instruction relating to due care; he who mounts a trailer hitch under that section had only to do "what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances." (No. 149.) The negligence was not in renting the trailer but in mounting the same. Nor do we find merit in appellants' brief unsupported argument that counsel's "use of section 701, subdivision (d) in cross examination and in witness Eckhart's testimony as to the inadequacy of the bumper" were error. Defendant Webb, who testified to his long experience in the trailer rental business, his experience in hitching and driving trailers and his familiarity with the customs and practice of the industry, of hitching and loading trailers, and to the character of the bumper, was properly cross examined relative to his awareness or knowledge of what the law (§ 701, subd. (d)) required of one who mounts a trailer hitch, and his qualifications. Similarly proper were questions asked Eckhart; moreover, the jury was instructed relative to the weight to be given to the testimony of an expert.

Lastly, appellants complain that an instruction that unskillful or improper treatment by plaintiff's physician, had it existed, was not a defense to the action if she used ordinary care in the selection of her physician, was itself improper in form and placed an issue of malpractice before the jury. We agree with the trial judge that this instruction does not relate to malpractice but only "to the matter of the plaintiff's claim here for injuries." We also conclude that the instruction contains a true statement of the law and that defense counsel's examination of plaintiff's physician relative to what he did, how he treated her and what treatment was proper, made the giving of the instruction proper. Among others he asked such questions as: ". . . am I correct in inferring that you never considered this problem serious enough to warrant a consultation by a nerve specialist, a neurologist?"; ". . . with reference to the atrophy of the muscles, did you ever at any time measure it?"; ". . . Now, is it possible that the result in her right shoulder, as you have described it, would have been different not only if the exercises had been done but if the fracture of the scapula had been reduced or set?"; "You

relied entirely on him (orthopedic specialist)?''; ''. . . there are methods to reduce and set fractures?''

For the foregoing reasons the judgment and order are affirmed.

Wood, P. J., and Fourt, J., concurred.